RACINE COUNTY, Plaintiff-Respondent,†

v.

William R. CAPE, Christopher Cape, and Warren
R. Cape, Cape Bros. Realty and Equipment and
James Cape and Sons Co., Defendants-
Appellants.

Court of Appeals

*No. 01–0740. Submitted on briefs November 8, 2001.—Decided
December 5, 2001.*

2002 WI App 19

(Also reported in 639 N.W.2d 782.)

† Petition to review denied 2-19-02.

On behalf of the defendants-appellants, the cause was submitted on the briefs of *R. William Phenicie* and *John E. Hotvedt* of *Lloyd, Phenicie, Lynch & Kelly, S.C.* of Burlington.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Matthew W. McVey*, assistant corporation counsel.

Before Nettesheim, P.J., Brown and Snyder, JJ.

¶ 1. BROWN, J. This case concerns the modernization of equipment at James Cape and Sons Co.,[1] a business that, among other things, crushes and recycles concrete, which is a nonconforming use under Racine County ordinances. Cape contends that its operation of the modernized crusher system only increases the frequency, intensity and volume of its recycling capabilities and presents no identifiable change in use. We agree with Cape's contention and reverse the order of summary judgment in favor of Racine County. We remand with directions that the trial court enter an order for summary judgment for Cape.

¶ 2. Cape is a road and utility construction business located in the town of Caledonia since the early 1960s. Its construction activities include highway projects, erosion control projects, underground sewer installation, water main construction and other general construction. In the course of its operations, Cape

---

[1] William R. Cape, Christopher Cape and Warren R. Cape are partners doing business as Cape Bros. Realty and Equipment and as James Cape and Sons Co. We refer to all of these parties as "Cape."

removes concrete from construction sites, stockpiles the material on its property and eventually reuses the concrete in future projects. This provides Cape with a competitive advantage in bidding for projects by reducing overhead and other operating expenses.

¶ 3. In 1970, the County enacted a zoning ordinance that prohibits recycling, stockpiling or crushing operations in the area of Cape's property. Cape continued its concrete salvaging activities as a legal nonconforming use. Cape utilized several methods to break down the concrete into smaller pieces for recycling. These methods included using dozer tracks to run over and crush larger chunks, use of a front-end loader to drop large pieces on top of one another, hydraulic hammers, and dropping frost balls[2] from a crane.

¶ 4. In 1992, Cape acquired a portable concrete crusher to use in its recycling operations.[3] After neighbors complained of the noise generated by the crusher, the County cited Cape for a zoning violation. Cape then petitioned the County to rezone a portion of its property to allow crushing. The County denied the petition and filed this lawsuit in 1998, requesting a court order prohibiting all of Cape's crushing and stockpiling activities. As an affirmative defense, Cape asserted that crushing is a legal nonconforming use that was in operation prior to enactment of the 1970 ordinance. Both parties moved for summary judgment. The trial court granted summary judgment to the County, hold-

---

[2] A frost ball, also known as a demolition ball, is made of iron, weighs between two and one-half to seven and one-half tons, and uses mechanical force to break concrete into smaller pieces.

[3] The crusher is a million dollar mechanized piece of equipment that, unlike other methods of crushing concrete, produces a small product of uniform shape.

ing that the crusher apparatus is an illegal expansion of use over the previous method of crushing by frost ball, and that such illegal expansion invalidated that entire nonconforming use.[4] Cape asserts that the wrong party was granted summary judgment and seeks reversal.

¶ 5.  In reviewing the grant or denial of a summary judgment motion, we are required to apply the standards set forth in WIS. STAT. § 802.08 (1999–2000)[5] in the same manner as the trial court. *Foresight, Inc. v. Babl*, 211 Wis. 2d 599, 602, 565 N.W.2d 279 (Ct. App. 1997). Those standards have been recited numerous times; we need not repeat them here. *Id.* Whether a particular use is an identifiable change or expansion of a legal nonconforming use is a question of law that we review de novo. *Id.*

¶ 6.  The parties agree that the outcome of this case is governed by *Waukesha County v. Seitz*, 140 Wis. 2d 111, 409 N.W.2d 403 (Ct. App. 1987) (*Seitz I*) and *Waukesha County v. Pewaukee Marina, Inc.*, 187 Wis. 2d 18, 522 N.W.2d 536 (Ct. App. 1994) (*Seitz II*). *Seitz I* concerned a marina owner who operated a lake resort providing cottage rentals, boat livery, and fuel and bait services. *Seitz I*, 140 Wis. 2d at 114. Subsequent to an ordinance that rendered Seitz's use nonconforming, he expanded the resort by enlarging his pier and docking more boats. *Id.* We rejected the County's argument that this development constituted an illegal expansion of a nonconforming use. We wrote:  "If an increase in volume, intensity or frequency of use is coupled with some

---

[4] The judgment allowed Cape's continued use of the property for stockpiling.

[5] All references to the Wisconsin Statutes are to the 1999–2000 version.

element of identifiable change or extension, the enlargement will invalidate a legal nonconforming use. . . . However, a mere increase in the volume, intensity or frequency of a nonconforming use is not sufficient to invalidate it." *Id.* at 117–18 (citations omitted). We noted that before the ordinance, Seitz dry-docked three to five boats whereas after the ordinance, he dry-docked fifty-four boats and wet-docked thirty-five boats. *Id.* at 114. Thus, Seitz engaged in the same activities after the ordinance as he did previously; he simply engaged in them on a larger scale. *Id.* at 121. On that basis, we held that the expansions in *Seitz I* were mere increases resulting from a change in the volume, intensity or frequency of the nonconforming use already existing. *Id.*

¶ 7.   By the time *Seitz II* commenced, Seitz had added a retail store and a place for lounging and entertainment. *Seitz II*, 187 Wis. 2d at 20. He also engaged in boat sales. *Id.* We noted that the material issue was not whether these new uses were related to a marina, but rather, "what kind of marina enterprises existed at the time of the ordinances' enactment and have those marina enterprises changed." *Id.* at 27 n.3. We articulated the rule that an identifiable change occurs when the type of service provided changes or "[i]f what the business puts into the stream of commerce changes." *Id.* We then affirmed the jury's conclusion that the extensions since *Seitz I* represented an identifiable change in the type of services rendered and the products sold. *Id.* at 27. Thus, business activities that had once provided the enterprise with its "true resort and marina flavor," *Seitz I*, 140 Wis. 2d at 116, had undergone an identifiable change such that the enter-

49

prise became "a multi-faceted enterprise that happens to be on a lake and in a marina-like setting." *Seitz II*, 187 Wis. 2d at 27.

¶ 8.   Cape argues that this is a *Seitz I* situation, that the increase in production of its salvaging operation by use of the crusher is an increase in frequency and intensity but does not change the character of the use. It asserts that an integral feature of its business has always been the reduction of large chunks of concrete into smaller pieces and that the crusher is an improvement to that operation. It emphasizes that the essential nature of the recycling is unchanged—Cape imports concrete only from its job sites, stockpiles it, breaks it down and then reuses the material in its own projects. This is still a single, albeit more efficient, enterprise, Cape urges, rather than a "multi-faceted enterprise" that is merely related to construction activities.

¶ 9.   The County responds that the crusher is a new use because it produces gravel, which is a new product that Cape could not have made using other methods of breaking down concrete. The County also argues that the crusher is not a mere replacement or modernization of the frost ball because by Cape's admission, the frost ball may still be used. Finally, according to the County, modernization of a nonconforming use is contrary to the principle articulated by Wisconsin courts that the spirit of zoning is to restrict a nonconforming use and to eliminate such uses as speedily as possible. *Seitz I*, 140 Wis. 2d at 116.

¶ 10.   We begin with the premise that Cape conducted breaking and recycling activities prior to enactment of the ordinance in 1970 and that this use of the

property is a legal nonconforming use.[6] Our task is to determine whether the change in the method of breaking down concrete on Cape's work site is an identifiable change in use. As we discuss below, we are persuaded that the crusher is an instrumentality that has expanded the frequency, intensity and volume of use but that the essential character of the use is unchanged.

¶ 11. We disagree with the County's argument that an identifiable change has occurred because the crusher produces gravel which is a new product in the stream of commerce. *See Seitz II*, 187 Wis. 2d at 27 n.3. The affidavits indicate that the crusher produces gravel, which is concrete reduced to approximately an inch and one-half in diameter, at a rate of 225 tons per hour. The frost ball, on the other hand, produces 300 to 400 tons per day and generates material that is irregular in size and shape. Furthermore, while a frost ball can produce a product six inches in diameter, it cannot economically break down concrete into gravel. Thus, we agree that at the time the ordinance was enacted, Cape's recycling operations did not produce gravel.

¶ 12. None of the affidavits the County offers, however, demonstrate that the gravel is a product that Cape puts into the stream of commerce. The gravel is simply produced and recycled into Cape's construction projects as its recycled materials always have been. We

---

[6] At oral argument before the trial court, the County argued first, that Cape had not established active and actual use prior to 1970, and second, that Cape had not established continuous use. *See* Wis. Stat. § 59.69(10). Failure to establish these elements would defeat Cape's legal nonconforming use defense. However, resolution of these issues requires factual findings that are not appropriate on motions for summary judgment. We therefore limit our review to the issues as the parties present them to us on appeal.

cannot conclude, therefore, that Cape's production of gravel for its own use is a change in the type of services offered or products sold. If the facts demonstrated that Cape had purchased concrete from other sources, broken it down into gravel and then sold it to outside customers, then we might conclude that an identifiable change in use had occurred. This scenario might indeed comprise a "multi-faceted enterprise" of buying and selling gravel in addition to Cape's construction activities. This is not the case presented to us, however. Cape's acquisition and use of the crusher allows it to accomplish in a more efficient manner a single enterprise in which it was engaged prior to enactment of the ordinance, namely, recycling its own concrete for the purpose of reducing overhead and operating expenses and to provide Cape with a competitive edge in its industry.

¶ 13.   We also point out that the ordinance in this case does not prohibit the production of gravel; it prohibits crushing and stockpiling of concrete. Therefore, the County's focus on the product rather than the prohibited activity misses the mark. By comparison, in *Seitz I* the ordinance prohibited marinas and boat liveries. *Seitz I*, 140 Wis. 2d at 113 n.2. We focused our inquiry on whether Seitz conducted the same type of marina enterprises after the ordinance as he had before. We concluded that enlargement of the dry-docking and wet-docking facilities was simply an extension of what had gone on before the ordinance was effective. *See Seitz II*, 187 Wis. 2d at 27 n.3 (discussing our holding in *Seitz I*). Applying that analysis in this case, we look to see whether Cape's prohibited crushing activity is simply an extension of the crushing activity that went on before. We agree with Cape that prior to the 1970 ordinance, it was engaged in a similar recy-

cling operation. The methods utilized were crude and incapable of producing a fine, regularly shaped product, but the overall process was the same: breaking down unusable chunks into smaller, recyclable pieces. With the crusher, put into use after 1970, Cape was able to break down the unusable chunks into a finer, more useful material. As in *Seitz I*, Cape was simply engaging in its pre-ordinance activity on a larger scale.

¶ 14. We also reject the County's argument that modernization of equipment is contrary to Wisconsin law. We firmly established in *Seitz I* that Wisconsin law protects expansion of a legal nonconforming use so long as the essential character of the use is not identifiably changed. *Seitz I*, 140 Wis. 2d at 121. Consistent with *Seitz I*, we now conclude that a change in the method or quantity of production of a nonconforming use is not an entirely new use when the original character of the use remains the same. This holding allows the operator of a nonconforming use to incorporate modern technology into his or her business without fear of losing that business. In this case, it allows Cape to innovate its outdated "Fred Flintstone" rock-breaking process with a mechanized production plant that produces gravel consistent with its intent to remove, stockpile and recycle its own concrete.

¶ 15. Having concluded in this particular case that a change in the method of production is not an identifiable change in use, we also reject the County's argument that continuing use of the frost ball by Cape invalidates the nonconforming use. As the facts in this case demonstrate, the older methods were not entirely obsolete; they were simply time consuming and costly for purposes of producing a finer product. Use of the

frost ball or hydraulic hammer in tandem with the crusher allows Cape to recycle its used materials more efficiently. There is nothing in *Seitz I* or *II* that invalidates a legal nonconforming use based upon an operation's more efficient performance of such a use.

¶ 16.  Finally, we recognize there may be circumstances where a more modern instrumentality would so drastically alter the nonconforming use as to render it a new and different use under the zoning ordinance. We are not faced with such circumstances in this instance. What we have here is a company that has increased its volume of production due to the greater efficiency of modernized equipment. The acquisition of that equipment is not a change in use in the manner that the addition of an entertainment lounge and retail store was a change in *Seitz II*.

¶ 17.  Cape requests that we not only reverse the trial court's grant of summary judgment to the County, but also that we reverse the trial court's denial of Cape's motion for summary judgment. We grant the request. We are entitled to assess not only the trial court's grant of summary judgment to the County, but also its denial of summary judgment to Cape. *See State v. Courtney E.*, 184 Wis. 2d 592, 598–99, 516 N.W.2d 422 (1994). As we said at the outset of this opinion, we do both de novo, in the same manner as the trial court. We reverse the trial court's judgment finding that the use of the crusher is an illegal expansion of the nonconforming use. We further reverse the trial court's denial of Cape's summary judgment motion asserting that the use of the crusher is a valid nonconforming use. We remand with directions that the trial court enter an order for summary judgment consistent with this opinion.

*By the Court.*—Judgment reversed and cause remanded with directions.